## BENJAMIN HANCOCK

*v.*

## NEWTON ELMER et al.

[Filed May 9th, 1901.]

1. A voluntary conveyance of lands made by a debtor, without consideration, is void as against existing creditors, irrespective of the value of the debtor's interest in the lands conveyed.

2 A debtor who was under pressure to pay his debt, conveyed all his property, save one piece of land, to his brothers, and then offered this piece, and another lot, part of the land conveyed, upon certain prescribed terms, to his creditor in payment of his debt. When the creditor refused the terms dictated by the debtor, the reserved lot was at once conveyed to one of the brothers, so that the debtor had no property remaining in his name. The brothers knew of this plan when they accepted their conveyances.—*Held*, that the transaction was a hindering of the creditor in the collection of his claim, and obnoxious to the statute of frauds.

On bill, answer and proofs.

The defendant Newton Elmer, for several years before the month of September, 1897, was, with one Albertson, indebted on their joint note to the complainant, Benjamin Hancock, for $875, which, by partial payments, has been reduced to $700. In 1896 Albertson's wife conveyed a lot of land to Newton to secure him against the Hancock note. Elmer then gave his note to Hancock, and Albertson was released from liability, the express purpose of the conveyance being, as stated, to secure Elmer for undertaking to pay Albertson's half of the note. In August, 1897, the note, with Hancock's endorsement, had been discounted by a bank. Hancock notified Newton Elmer that it must be paid. Newton Elmer made no reply, but on the 21st of September, 1897, transferred to his brother, the defendant Ellison Elmer, eighty shares out of eighty-two shares of stock held by Newton Elmer in the Bassett Glass Company, and on the 22d day of September, 1897, for a consideration of

$1, conveyed six lots of land to another brother, the defendant Lafayette Elmer, and on the same day, for a named consideration of $100, conveyed to his brother, the defendant Ellison Elmer, all his remaining real estate, consisting of dwelling-houses, a block of stores, his residence in Bridgeton and other property, except one single lot of land, which was subsequently, on October 7th, 1897, also conveyed to the defendant Ellison Elmer. Shortly afterwards Mr. Newton Elmer sent word to the complainant that he could not take care of the $700 note; that he had made over his property to his brothers, but that he was willing to convey the lot he had retained, at a price and upon terms prescribed by himself, if the complainant would assume the payment of the note then in bank and give it up to him. This the complainant refused to do. On October 28th, 1897, the complainant having demanded that Mr. Newton Elmer should pay the note, the latter wrote him, stating,

"I made you the best proposition which it was in my power to do for you, and as you did not choose to accept it, I have been compelled to drop the matter."

Again, on November 8th, 1897, he wrote to the complainant, acknowledging his indebtedness on the note, and stating the following reasons for his action:

"Your notice to me that you insisted upon my releasing you as my endorser and that I must get another endorser, which I was unable to do, forced me to make the best arrangement which I could to pay my debts, and in making such arrangements the best that I could do for this note was the proposition which I originally made you through Mr. Sheppard, which was refused by you. As a result of your action, I am now, as I said, in a position where it is impossible for me to do anything in the matter at this time."

The complainant then took the note out of bank, sued upon it and recovered judgment in the supreme court for the sum of $742.99, damages and costs, and issued execution thereon to Cumberland county. A return was made "no goods or lands found." On February 26th, 1898, the complainant filed his bill of complaint in this cause, setting up the above-mentioned facts and charging that Newton Elmer's transfer of the glass com-

pany's stock and his conveyance of all his lands to his brothers Lafayette and Ellison Elmer were fraudulent and for the purpose of hindering and defeating the complainant in the collection of the debt due to him; praying that the fraudulent conveyances might be set aside and declared void, and the lands and stock sold, discharged of any claim thereunder, and the proceeds applied to the payment of the complainant's debt.

The defendants Newton Elmer and Ellison Elmer filed a joint and several answer, and the defendant Lafayette Elmer and his wife filed a separate answer, all by the same solicitor. They admit the complainant's debt, judgment and the conveyances by the defendant Newton Elmer, set forth in the bill of complaint, but they deny the values ascribed in the bill to the premises conveyed, and deny that the conveyances were without consideration, and say that they were for full consideration and in good faith on the part of all the parties to the deeds. They expressly deny that these conveyances were made for the purpose of preventing the defendant from collecting his claim against Newton Elmer, or to defraud or cheat him as alleged in the bill. Issue was joined on these pleadings, and the cause has come to a hearing.

*Mr. Walter H. Bacon,* for the complainant.

*Mr. David J. Pancoast,* for the defendants.

Grey, V. C.

It is admitted, without contention, that the defendant Newton Elmer was indebted to the complainant at the time he made the deeds attacked in this cause. It is also admitted, without dispute, that, shortly after the complainant demanded of Newton Elmer the payment of his debt, the latter conveyed all his property (except one lot hereafter dealt with), by the two deeds in question, one to his brother, the defendant Lafayette Elmer, passing title to six lots of land, the other to his brother, the defendant Ellison Elmer, passing title to twenty-two lots of land. Newton also transferred all of his shares of stock, except two, to his brother Ellison. Of all his lands he retained

in his own name but one piece, the Morris avenue lot. The purpose for which he had actually retained this lot is proven. He kept this in order to offer it to Mr. Hancock (with other property which he had conveyed to his brother Lafayette), in satisfaction of Hancock's debt, upon the latter's undertaking to assume a $2,000 mortgage. That is, a debtor conveyed all his property away, save one piece, and then turned to his creditor and, in effect, said:

"I have so arranged my property that you cannot apply any of it, save this one piece, to the payment of the claim against me which you hold. If you will take what I offer you upon the terms I dictate, and discharge your claim, well, if not you will not get even so much as I now offer you."

Upon Hancock's refusal to accept this proposition, Newton Elmer conveyed this last lot also to his brother Ellison, for a named consideration of $100.

So far as Newton Elmer is concerned, the evidence that this was the situation of affairs is largely in his letters to Mr. Hancock and his deeds to his brothers Lafayette and Ellison.

That such transactions are frauds upon creditors is apparent upon the mere statement of the case. They are within the very words of the statute of frauds: Conveyance made with intent to "hinder, delay and defraud creditors of their lawful actions."

The separate answers of the brothers deny that there was any fraud in the conveyances to them, and assert that they were made in good faith and upon full consideration paid. Their relation to the transactions in question must be separately considered.

I will first examine the conveyance to Lafayette Elmer. He was called and sworn as a witness in this cause. His testimony shows that when he accepted his brother Newton's deed to him for the six different lots of land he knew that Newton was not able to pay his bills, and that he was indebted to Mr. Hancock, and that one of the objects in making the conveyance was to put Newton Elmer in a position to make such offers to Hancock as he might deem favorable to himself. Lafayette accepted the conveyance upon the understanding that part of the property conveyed to him was to remain at Newton's discretion to

be used to settle the Hancock debt. So that, after the conveyance by Newton to Lafayette, the former was, by the bargain between them (if such dealing can be called a bargain), to retain control of at least part of the property conveyed. Lafayette himself swears that incident to the conveyance by Newton to him, speaking of one of the lots conveyed, the former said:

> "I want to get Mr. Hancock, if he will, to take this property back, and assume that much of what I owe him. Now, if he does that, I want you to deed it to Mr. Hancock, if he will accept it, and if not it is yours forever for one dollar."

The consideration for the conveyance of the whole six lots to Lafayette Elmer is expressed in the deed to be the sum of $1. Lafayette testifies that there was an actual consideration in an indebtedness which his brother Newton owed to him. On this point the testimony of Newton and Lafayette is in direct antagonism and is wholly irreconcilable. Newton Elmer swears that the conveyance to Lafayette "was made for the consideration named in the deed," and that "the deed was not supposed to settle the other indebtedness that I owed him." The deed itself shows no undertaking on Lafayette's part to pay any of the mortgages on the lands conveyed, nor is there any proof of any act between the parties in the nature of a discharge by Lafayette of any indebtedness owed him by Newton.

The conveyance to Lafayette Elmer referred to in the bill of complaint must be held to have been without substantial consideration, and for the purpose of hindering, delaying and preventing the creditors of Newton Elmer from applying his property to the payment of his debts.

A much more elaborate defence is made of the transfer of title by Newton Elmer to his brother Ellison Elmer. The shares of stock in the Bassett Glass Works and the twenty-two different lots of land have considerable value. The contention on the part of Ellison Elmer is that he is a purchaser of all that property for full value paid, and without notice of any fraudulent purpose in the conveyance to defeat or hinder the creditors of Newton Elmer.

The evidence shows that Newton and Ellison were brothers.

A few years before the transactions attacked in this suit they had been partners in business. At the time Ellison Elmer accepted the transfer of his brother Newton's glass company shares and the conveyance of substantially all the land he owned, the two brothers were the owners in common of valuable real estate.

They were not only brothers, but were also intimate friends, evidently interested in, and acquainted with, each other's business. Ellison himself testifies that he had been informed by Newton that he had undertaken to pay the $700 note to Hancock. He also knew that Hancock wanted his debt paid, and that Newton retained the title to the Morris avenue lot because he intended to use it in aid of a settlement to be obtained from Hancock. For this reason Ellison says he did not at first take title to this lot as well as to the other twenty-two. He knew of the conveyance to Lafayette, for he swears that the reason he did not take title to the six lots conveyed to the latter was that he thought there was no value in them above the mortgages. It thus appears that all the transfers made by Newton Elmer to his brothers were related to each other, and were substantially one transaction. Each was made in contemplation of the other, by all the parties, and, in making and accepting them, all the parties had in view the effect they would have upon the note which Newton owed to Hancock. When the scheme to force Hancock into a settlement failed, Ellison at once accepted a special deed from Newton, conveying the Morris avenue lot, thus stripping Newton of all title to any property.

We have then this combination of circumstances:. that a debtor who is pressed for payment by a creditor arranges with his brothers to convey all his property to them, save one certain piece, and to offer his creditor certain terms of settlement, including a conveyance to him of this reserved piece and another lot (a part of the property conveyed), and when the creditor refused to accept the terms prescribed by the debtor, the reserved lot is also conveyed to one of the brothers, so that the debtor has no remaining property. This is clearly a hindering of the creditor from the collection of his debt. In this interference with the legal assertion of the creditor's rights, those

who knowingly accept the conveyances participated quite as fully as the grantor debtor who made them. The action of both was necessary to carry the scheme into effect. The common purpose to block the creditor in the pursuit of his lawful remedy exists; each party, in furthering it, performs his proper part. The vendee who acquires title from a debtor in failing circumstances must not only be a purchaser for value, but also a purchaser in good faith. *Second National Bank* v. *O'Rourke, 13 Stew. Eq. 99.* If he has notice of facts which bring home to him knowledge of the fraudulent intent, he participates in the fraud if he passively accepts the transfer of the debtor's title. *New York Fire Insurance Co.* v. *Tooker, 8 Stew. Eq. 408.* Conveyances thus made to hinder the recovery of debts are void as against creditors. *Livermore* v. *McNair, 7 Stew. Eq. 478; McKeague* v. *Armstrong, 5 Dick. Ch. Rep. 310.* Conveyances by a debtor made pending a suit against him, or when his creditors are pressing for payment, which embrace substantially all of the debtor's property, are considered to be tainted with fraud. *Christie* v. *Bridgman, 6 Dick. Ch. Rep. 335 (Court of Appeals).*

The consideration of the conveyance of the glass company stock to Ellison Elmer is claimed to have been $2,000, and of the twenty-two lots of land to have been $4,033, and for the one Morris avenue lot $100. The whole of this, except $20 (paid in cash), is claimed to have been allowed as a credit upon debts alleged to have been owed by Newton to Ellison. The $20 paid in cash was of itself an odd incident, if the story of the Elmers be accepted as true, for they say that Newton's debt to Ellison exceeded the valuation put upon the former's interest in all the property conveyed. If this be true, the $20 cash must have been a pure gift, or else was made to give to the transaction an appearance of good faith. The debts claimed to have been owed by Newton to Ellison were, in part, $2,000 of promissory notes made by Newton and endorsed by Ellison. At the time the conveyances to Ellison were made none of these notes had come to be due. Ellison Elmer himself testifies that the notes were held in bank at the time the conveyances were made, and that he did not pay them at the time he accepted

his deeds, but did afterwards pay them as they subsequently came to be due. In the case of *Severs* v. *Dodson, 8 Dick. Ch. Rep. 639,* the court of appeals declared that an accommodation endorser of a promissory note is not a debtor to the holder, in the sense prescribed by the statute of frauds, until the endorsed note has been dishonored. It seems to follow that such an accommodation endorser, as long as the note remains unpaid, has not become a creditor of the maker. He could only become such a creditor by actual payment of the note. So far as the conveyances depended, at the time they were made, upon this $2,000 worth of commercial paper, they were without consideration, for Ellison Elmer himself expressly testifies that they were absolute conveyances, and not by way of security, and that there was an absolute cancellation of the debt which Newton owed to him to the extent of the values allowed for the equities of the property conveyed. There was, in fact, no actual cancellation or surrender of these evidences of debt coincident with the delivery of the deed, nor, indeed, so far as the proof shows, at any time since.

Another element that adds to the shade of fraud which extends over these transfers of property is the omission of the defendants, though informed by the issues joined that they were impugned for fraud, to call as witnesses those persons who aided them in drawing and witnessing the transfers, and who could explain the nature of the transactions. Neither the draftsman who drew the deeds, the officer who took the acknowledgments, nor the person who witnessed the execution of the most important exhibits was called to testify. The hasty way in which the transfers were made and accepted—twenty-nine pieces of property passed, without examination of titles or for encumbrances, almost immediately that their conveyance was proposed—is another indication of fraudulent intent. The testimony shows also that the grantor (Newton Elmer) himself took the custody of the deeds upon their execution, and himself carried them to the clerk's office for record and paid the charge therefor, thus indicating, after the title passed from him, a continuing interest in the property.

Upon the question of the valuation of the property conveyed

Hancock *v.* Elmer.

there is considerable dispute in the testimony. The weight of the evidence shows that the South Laurel street stores, the most valuable single tract, have been substantially undervalued in the estimate made for the purpose of conveyance to Ellison Elmer. Several of the other properties have been placed at figures much less than their actual value, certainly much less than the whole amount due to the complainant. The value put upon the glass company's stock was also substantially less than its real value.

Some claim has been made by the defendants that the transactions in question must be dealt with as purchases of land, and that a difference of opinion as to value of the land conveyed, where some valuable consideration was paid, will not raise a presumption of fraud, and cases are cited to sustain this view. The evidence of both Newton and Ellison Elmer goes, however, to insist that the transfers made were in payment of debts owed by Newton to Ellison—not sales of lands. If, in paying a debt in money, Newton had given $1 more than the amount of the debt, the payment would have been, to that extent, as to creditors, a fraud. The debtor has no greater right to give away value in lands than he has in money. If there was more value paid than was due, the overplus was in fraud of creditors. It need not have been so large as to be held unconscionable to justify the challenge of the transaction by creditors.

Upon the whole case there has been a showing that all the transfers and conveyances challenged by the bill of complaint were executed with a purpose and upon an understanding, common to the defendants Newton Elmer and his brothers to interfere with and prevent the collection of the debt then existing and due from Newton Elmer on the note since put in judgment by the complainant, Benjamin Hancock. There should be a decree that these conveyances are void as against the debt due the complainant, Hancock, for which he has recovered judgment, and that the property so transferred should be sold and the proceeds applied to the satisfaction of the complainant's claim, with costs of the suit to be awarded to him.

I will advise such a decree.