MYRON L. LEVY, trustee in bankruptcy of Michael Latorre and Annie Latorre, bankrupts, complainants,

*v.*

ANIELO D'ALESANDRO et al., defendants.

[Decided June 25th, 1936.]

*Mr. Michael G. Alenick,* for the complainant.

*Mr. Frederick A. Pope,* for the defendant Anielo D'Alesandro.

*Messrs. Chiaravalli & Fioravanti,* for the defendants Michael and Annie Latorre.

EGAN, V. C.

On September 28th, 1934, the defendants Michael and Annie Latorre, husband and wife, each filed a voluntary petition in bankruptcy. The complainant was appointed trustee in those proceedings. He filed the bill herein which seeks to set aside, as fraudulent, certain conveyances made by the defendant Annie Latorre to her father, Anielo D'Alesandro.

The defendants Michael and Annie Latorre, on July 9th, 1924, purchased the premises known as No. 97 West Fifty-

second street, Bayonne, New Jersey, subject to a mortgage of $5,500 held by Sophie F. Breithaupt which she assigned to Eugene E. A. Dombrowsky and Jeanette J. Dombrowsky, his wife. Five months later, or on December 11th, 1924, the Latorres gave a second, or subsequent mortgage on the same property for $2,750 to Umberto Taino. On July 19th, 1926, they conveyed the property to Susie Leibowitz, who, on the same day, conveyed it back to Annie Latorre. Then, on October 21st, 1926, the Latorres gave a mortgage for $3,500 on the premises to Julius and Mary Dvorin.

The first mortgagees foreclosed their mortgage, and the sheriff of Hudson county on August 10th, 1927, conveyed the property to Umberto Taino for the sum of $6,550, that being the amount the property brought at the sheriff's sale. The foreclosure proceedings disclosed these sums due: the first mortgagees were entitled to $5,822.16; the second mortgagee, Taino, was entitled to $2,907.66; and the third mortgagees, Dvorins, were entitled to $3,624.83.

The Latorres testified that they purchased the Bayonne property for $11,000; $2,500 thereof being paid in cash, which sum they stated, they borrowed from one Perozzi. Perozzi was engaged in the real estate business and was experienced in that business. For the loan, he received no security, no mortgage, bond, note, writing or evidence of indebtedness from the Latorres. The Latorres said that subsequently, in order to pay Perozzi's claim, they, some four or six months later, borrowed from the Dvorins the sum of $3,000 on the Bayonne property. Dvorin testified, and he is supported in his testimony by former Judge Horace Roberson of Bayonne, that the Latorres represented that they wanted the money for the purpose of purchasing, and operating, an automobile bus. In addition to giving the Dvorins a bond and mortgage as security for the loan, the Latorres gave the eighteen promissory notes, of which the first seventeen were each in the sum of $200, plus interest, and the eighteenth note was in the sum of $100, plus interest.

Latorre, in the bankruptcy proceedings before Referee Porter, contradicted Dvorin's testimony about the purported

object of the loan, and testified that he used the Dvorin money to buy the Bayonne property. It will be observed that the Bayonne property was conveyed to the Latorres on July 9th, 1924, while the mortgage to Dvorin is dated October 21st, 1926, some two years later. That discrepancy, certainly, does not lend credit to Latorre's testimony. Latorre, however, did not purchase the bus. Within a short time after Dvorin advanced them the $3,500, the Latorres moved from Bayonne and made their residence in Finderne, New Jersey. On August 22d, 1927, Annie Latorre, under her maiden name of Annie D'Alesandro, purchased property located on the corner of Finderne avenue and East Main street, Finderne, New Jersey, and paid on account of the purchase thereof the sum of $3,500. That payment, the complainant contends, was the money that was borrowed from Dvorin. This property was purchased from Edward F. and Hilda K. Meyers and Bernard and Susie Levin, through negotiations by the said Michael Latorre with the said Edward F. Meyer. The deed was recorded September 12th, 1927. At the time of the passing of the title to Annie Latorre under her maiden name of Annie D'Alesandro, as aforesaid, she executed a purchase-money mortgage for $5,000 to Edward F. Meyer and Bernard Levin; and, in the mortgage, she is designated "Annie D'Alesandro, single." On July 16th, 1928, the Latorres, calling themselves Annie (Anna) D'Alesandro and Mike D'Alesandro, respectively, executed a mortgage for $8,000 covering the premises last aforesaid, to Bernhard Meyer. Approximately one and a half years later, or on February 13th, 1929, they again assumed the names of "Annie D'Alesandro and Michael D'Alesandro," and conveyed the property to Anielo D'Alesandro, the father of Annie aforesaid.

The reason for this last mentioned conveyance, as related by the Latorres, and Anielo D'Alesandro, and witnesses produced in their behalf, is that at the time the property was conveyed from the Meyers and the Levins to Annie Latorre (or "Annie D'Alesandro"), Anielo D'Alesandro furnished the purchase price, and was the real purchaser. Their testimony is to the effect that Anielo desired his son, William.

who then resided in Brooklyn, to take the title to the premises, and engage in business in Finderne. William signed the contract to purchase from Meyer and Levin. He subsequently refused to accept the title and informed his father that he intended to settle in California. He went to that state and remained there about nine months, when he returned to Brooklyn, where he still resides.

Anielo was displeased with the attitude of his son, and he, thereupon, directed that the title to the property should be placed in the name of his said daughter, Annie, who agreed to take the title. The contract, allegedly executed by William for the purchase of the property, was not produced at the hearing.

As above indicated the deed to the Finderne property is dated August 22d, 1927. The conveyance to Anielo, by his daughter and son-in-law, was by deed dated February 13th, 1929. No reason appears why Anielo could not have taken the title to the premises in his own name on August 22d, 1927, as well as on February 13th, 1929. No testimony except the oral statements of the defendants was presented as to the circumstances surrounding the passing of the title to the premises. The attorney of William D'Alesandro supports the testimony of Anielo D'Alesandro to the effect that he, Anielo, advanced the purchase price for the property. It does not appear quite clear to me why Anielo allowed the title to the premises to remain in his daughter's maiden name for almost two years before requesting that it be transferred to him. Again the record shows that Annie, in July, 1928, while the title was in her name, obtained and placed an $8,000 mortgage on the property.

On February 5th, 1929, Julius and Mary Dvorin instituted, in the New Jersey Supreme Court, an action against Michael and Annie Latorre, and on April 26th, 1929, recovered a judgment against them for $4,080.70. Within eight days after initiating the Dvorin action, or on February 13th, 1929, the premises were conveyed to Anielo. These circumstances stand out: Michael Latorre had conducted on the premises, a liquor saloon, a grocery store, and a gasoline station. The

saloon was called "Mike's place;" and the gasoline station was named "Mike's Gas Station." Latorre managed the saloon and the grocery store, and served patrons at the gasoline station. The liquor licenses, in at least two instances, were taken out in his name. Subsequently, Anielo appeared at the liquor license bureau, in the town, and requested that the license be changed to his name. He was then informed by the clerk of the bureau that it would be advisable to withhold his application to have the name changed until the expiration of the term for which the license had been issued. That was done; and, from then, the liquor license appeared in the name of Anielo D'Alesandro.

There appears of record in the Somerset county clerk's office, conditional sales agreements covering chattels in the saloon in which the name of Michael Latorre appears as the purchaser. There is one conditional sales agreement dated April 19th, 1933, entered into by Lebenfeld Brothers, Incorporated, of New York, with "Mike Latorre, Main Street and Millstone Road, Finderne, New Jersey," purchaser. That sales contract covered: one twelve-foot front bar with six-foot return, one twelve-foot back bar, one beer cooler (two beer and one water), two four-foot copper workbenches, brass rail and brackets, one electric beer pump, two bungs and rods.

The grocery store was conducted by Latorre; he attended on the customers who made purchases there, and represented himself to them as the owner. In the bankruptcy schedules, Latorre listed as creditors, concerns which supplied groceries and fruits to the grocery store. In 1932 Latorre purchased in his name equipment for the gasoline station. A building concern submitted evidence that they had sold material to "Annie D'Alesandro," which was used to improve the real estate where the gasoline station was located in Finderne. Promissory notes were given by the Latorres to creditors for supplying material, and for performing concrete work for, and about, the Finderne property. There is the testimony of a laborer who said he was employed and paid by Michael Latorre for working in and about the same property.

Latorre negotiated for loans on the property with several

people, among them men named Pratti, Ruggieri and Meyer, in the course of which, he represented himself as the owner. Ruggieri, who holds a mortgage on the Finderne property, confirms this testimony that Latorre said he was the owner. Pratti, who was a salesman and collector for the firm of Gunzelman & Cramer, who supplied material for the improvement of the Findern property, testified to the same effect. I am convinced that the premises in question belonged to the Latorres.

The defendants charge that the complainant is guilty of laches. I do not agree with them. I do not find the complainant wanting in diligence. I think he was vigilant and has acted with due promptness. Where there is evidence of fraud, equity will not permit the statute of limitations to give aid and comfort to a transgressor by barring relief to one who has exercised due diligence. *Sun Building-Loan Association* v. *Rashkes, 119 N. J. Eq. 443; 183 Atl. Rep. 274.* "Laches is not like limitation, a mere matter of time, and the question as to what constitutes laches must be determined, not only from the lapse of time, but also from the facts and circumstances of the particular case and according to right and justice." *27 Corp. Jur. 764 § 655; Burne* v. *Patridge, 61 N. J. Eq. 434; 48 Atl. Rep. 770.*

In *Patrick* v. *Groves (Court of Errors and Appeals), 115 N. J. Eq. 208; 169 Atl. Rep. 701,* Mr. Justice Heher, who delivered the opinion for the court, said:

"Courts of equity ordinarily act in obedience and in analogy to the statute of limitations, but they will not allow the bar of that statute to prevail where it would further manifest injustice. *Lincoln* v. *Judd, 49 N. J. Eq. 387.* In equity the period of limitation begins to run only from the discovery of the fraud by the injured party, or until he was in a situation where, by the exercise of reasonable diligence, he would have discovered the fraud. *Lincoln* v. *Judd, supra; Todd* v. *Rafferty's Admrs., 30 N. J. Eq. 254, 258; Somerset County Bank* v. *Veghte, 42 N. J. Eq. 39, 41; Vane* v. *Vane (L. R.), 8 Ch. 383, 398; Rolfe* v. *Gregory, 4 De G., J. & S. 576, 579; Sherwood* v. *Sutton, 5 Mass. 143; Fed. Cas. No. 12, 782; Dodge* v. *Essex Insurance Co., 78 Mass. 65.*"

There is no doubt in my mind that the act of the trustee in filing the bill herein is fully justified. The Bankruptcy act empowers him to institute proceedings to avoid fraudulent transfers by a bankrupt and it settles the right of such complainant to maintain this action. Section 70 E of the Bankruptcy act (*11 U. S. C. A. § 110 (e)*) says:

"The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a *bona fide* holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a *bon fide* holder for value. For the purpose of such recovery any court of bankruptcy as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

In the case of *Crane v. Brewer, 73 N. J. Eq. 558; 68 Atl. Rep. 78,* Vice-Chancellor Howell held (syllabus 4):

"Under the express terms of the Bankruptcy act of July 1st, 1898 (*30 Stat. 565 ch. 541 § 70e; U. S. Comp. Stat. 1901 p. 3451; 11 U. S. C. A. § 110 (e)*), a trustee in bankruptcy represents all the creditors of the bankrupt, and takes all his property and rights and may institute such proceedings to avoid illegal transactions as any of them might." *United States Fidelity and Guaranty Co. v. Fuoco, 112 N. J. Eq. 238; 164 Atl. Rep. 28; Fischer, Trustee in Bankruptcy, &c., v. Cannato, 111 N. J. Eq. 345; 162 Atl. Rep. 529; Ellend, Trustee, &c., v. Marks, 109 N. J. Eq. 503; 158 Atl. Rep. 399; Unger, Trustee, &c., v. Mayer, 105 N. J. Eq. 253; 147 Atl. Rep. 509.*

In *Gilbert's Collier on Bankruptcy* (1927 edition), *1079,* the following appears:

"By sub-division (4) property transferred by the bankrupt in fraud of his creditors passes to his trustee. This is the converse of the doctrine that trustees take title subject to equities; they also take title to property which the bankrupt has fraudulently transferred, and in which, therefore, the creditors have equities. The trustee's interest in such property is stronger than was that of the creditors in whose stead he stands, for he has a title. The trustee is vested not only with the title of the property, but also with the credi-

tors' rights of action with respect to property of the bankrupt fraudulently transferred or incumbered by him, and he may assail in their behalf all of such transfers and incumbrances to the same extent as though the debtor had not been declared a bankrupt."

The conveyance in the instant case comes within the inhibition of the *Uniform Fraudulent Conveyance act, chapter 213, laws of New Jersey 1919, page 500. Cum. Supp. Comp. Stat. 1911-1924 p. 647 §§ 44-142 et seq.* The evidence in the case convinces me that no part of the moneys advanced toward the acquisition of the title to the premises was provided by Anielo D'Alesandro. The fact that Annie Latorre took the title under the name of D'Alesandro, rather than in her own name, and her assertion in the purchase-money mortgage given to Levin and Meyer that she was single, in my opinion, were acts of fraud. The subsequent execution of the mortgage by her and her husband, both signing under the name of "D'Alesandro," was not an accidental mistake. It was the result of mature deliberation; done with an impure motive, and for the evident purpose of hiding their identity as the real owners of the property with the object of perpetrating a fraud upon the creditors.

At the time of the conveyance to Anielo D'Alesandro, the Latorres were unquestionably insolvent, and regardless of their intent, the conveyance is nevertheless deemed to be fraudulent. *Dixon* v. *Eckert, 117 N. J. Eq. 544; 176 Atl. Rep. 560; Fischer* v. *Cannato, supra; Joseph Lande & Son, Inc.,* v. *Amico, 109 N. J. Eq. 487; 158 Atl. Rep. 328.*

The *Uniform Fraudulent Conveyance act* provides that a voluntary conveyance by one who is insolvent, carries with it a presumption of fraud. *Horton* v. *Bamford, 79 N. J. Eq. 356; 81 Atl. Rep. 761; Haston* v. *Castner, 31 N. J. Eq. 697.* It may be mentioned that in dealings between close relatives, the courts closely scrutinize their actions. *Gnichtel* v. *Jewell, 59 N. J. Eq. 651; 44 Atl. Rep. 1099; affirming, 41 Atl. Rep. 227; Conway* v. *Raphel, 102 N. J. Law 531; 141 Atl. Rep. 804.*

Section 4 of the *Uniform Fraudulent Conveyance act of 1919 (Cum. Supp. Comp. Stat. 1911-1924 p. 647 § 44-145),* provides that:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

*Hull* v. *Angster, 107 N. J. Eq. 454; 153 Atl. Rep. 93; Kaplan* v. *Heiles, 107 N. J. Eq. 443; 152 Atl. Rep. 855.* In *Parsells Petroleum Products* v. *White, 109 N. J. Eq. 364; 156 Atl. Rep. 832,* the court said:

"The complainant prays that the said conveyance may be set aside as fraudulent.

"This is entirely a factual question, and I am forced to the conclusion that it was fraudulent. The defendant Helen G. White produced her banking record in the Delaware County Trust Company, but she failed to produce the records of the bank in which she claims to have deposited the money received from Eugene F. White for said conveyance. I am bound to believe that had she been in possession of such records that she would have produced the same, and her failure to produce that record, it being within her power to submit it to the court, almost inevitably leads to the inference that she did not produce it because she knew that its contents were adverse to her contention, and the mind finds no difficulty, as a matter of reason, in feeling that she knew that the fact is otherwise than she claims it to be; and that upon a full disclosure of all of the circumstances affecting the case, she would not deserve to succeed. *Chamberlain's Hand Book on Evidence 440.* Under these circumstances, I am bound to conclude that the conveyance was fraudulent."

In the instant case, the alleged contract of purchase was not produced. See the case of *United States Fidelity and Guaranty Co. and Weitz, Trustee,* v. *Fuoco, 112 N. J. Eq. 238; 164 Atl. Rep. 28,* in which the court said:

"The transactions between the defendants were complicated and I have considered them in detail, with the result that the explanations made by the defendants do not seem to me to be credible. The testimony in support of the three assignments of the mortgage under attack comes wholly from the lips of the parties vitally interested in maintaining their

validity, and I consider such testimony discredited by the circumstances, by the improbability of transactions being carried on in the manner testified to and by the light of human experience. The assignments were all made for past due consideration and at a time when Fuoco was becoming or was involved in the financial difficulties which later caused him to file a petition in bankruptcy and the burden of sustaining their *bona fides* is on the Nardellis. I consider the evidence insufficient to sustain the burden and there will be a decree for complainants."

Under all the circumstances, I am satisfied that the complainant is entitled to the relief prayed for.